**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited.  R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0533-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

FRANKLIN PRATHER,

     Defendant-Appellant.

_____

Submitted September 12, 2024 – Decided September 24, 2024

Before Judges Natali and Vinci.

On appeal from the Superior of New Jersey, Law Division, Union County, Indictment No.  06-10-1015.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Laura B.  Lasota, Assistant Public Defender, of counsel and on the brief).

William A.  Daniel, Union County Prosecutor, attorney for respondent (Meredith L.  Balo, Assistant Deputy Prosecutor, on the brief).

PER CURIAM

Defendant Franklin Prather appeals from the Law Division's September 30, 2021 order denying his motion for a new trial based on newly discovered evidence. We affirm.

Following a 2008 trial, a jury convicted defendant of first-degree robbery, N.J.S.A. 2C:15–1; felony murder, N.J.S.A. 2C:11–3(a)(3); third-degree unlawful possession of a handgun, N.J.S.A. 2C:39–5(b); and second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39–4(a). After appropriate mergers, defendant was sentenced to an aggregate forty-year term of imprisonment, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43–7.2.

We affirmed defendant's conviction and sentence. State v. Prather, No. A-3221-08 (App. Div. May 13, 2013). The Supreme Court denied certification. State v. Prather, 216 N.J. 430 (2013).

We recount certain facts summarized in our unpublished opinion and other pertinent evidence adduced at trial.

> In the late evening hours of Monday, July 3, 2006, the lifeless body of Paul Capers, Sr., a locally well-known paving and construction contractor, was found in his basement apartment on Valley Street in the Vauxhall section of Union Township. Capers operated his business from the same address. He had been shot once in the chest. Defendant . . . and Maurice Knighton were indicted for the murder and other related crimes.

2

> Pursuant to a plea bargain reached with the State before trial, Knighton pled guilty to aggravated manslaughter, N.J.S.A. 2C:11–4a, and subsequently testified at defendant's trial.
>
> [Prather, slip op. at 1-2.]

Detective William Fuentes of the Union Township Police Department was assigned to investigate the murder and worked closely with Detective Patricia Gusmano of the Union County Prosecutor's office. Id. at 4-5. On July 4, Detective Fuentes interviewed Knighton based on what he described as "chatter in the neighborhood." Id. at 5.

On July 6, Detective Fuentes interviewed defendant's cousin, Larry Prather (Larry).[1] Ibid. While in the detective's car, Larry received a phone call from defendant. Ibid. Larry told defendant he was with Detective Fuentes driving to the police station and asked if defendant wanted to speak with the detective. Ibid. Defendant hung up. Ibid. Later that day, Detective Fuentes learned defendant was in the lobby of police headquarters waiting for him, and Detectives Fuentes and Gusmano interviewed defendant for the first time. Ibid.

> The detectives interviewed Knighton again . . . on July 6. Knighton confessed to shooting Capers and claimed defendant was there at the time because they planned to rob Capers. [Detective] Fuentes left headquarters to go

---

[1] To avoid confusion, we refer to members of defendant's family by their first names. By doing so, we intend no disrespect.

A-0533-22

next door to purchase . . . cigarettes [for] Knighton . . . . Although [Detective] Fuentes had told defendant he "could go home" after his interview, defendant approached [Detective] Fuentes in the lobby of police headquarters and began questioning him about the investigation. Defendant was in the company of his father, Franklin Prather, Sr. (Franklin Sr.), from whom [Detective] Fuentes had already secured a statement.

[Detective] Fuentes acknowledged speaking with Knighton again. Defendant followed [Detective] Fuentes as he purchased cigarettes . . . and returned to headquarters, persistently asking him questions about the case. . . .

[Id. at 6-7.]

Detective Fuentes left headquarters again to obtain arrest warrants for Knighton and defendant. Id. at 7. When he returned to headquarters, defendant was still in the lobby. Ibid. Detective Fuentes arrested defendant and interviewed him a second time. Ibid. Both interviews of defendant were recorded and played for the jury.

During the second interview, Detective Fuentes told defendant there were security cameras at a shopping mall adjacent to Capers's residence, implying there was video evidence of defendant's presence at the scene. In response, defendant admitted he was in the rear yard of Capers's residence on the night Capers was shot, but contended he was there because he was chasing Knighton who had stolen money from him, not to rob Capers. Specifically, defendant

4

claimed he jumped a fence from the shopping mall into Capers's yard and saw Knighton leaning into Capers's window. Defendant contended Knighton was armed and fired at him, grazing defendant's leg, and defendant fled by again jumping the fence.

> Sandra Dean [testified at trial she] lived in a first-floor apartment in Capers's building on Valley Street. Sometime between 11:00 and 11:30 p.m. on the evening of July 3, 2006, she heard a loud noise from the downstairs apartment and called 9–1–1. . . .
>
> Between 10:30 and 11:00 p.m., Geiner Fernandez, Dean's next door neighbor, was on his front porch . . . . A [Black] man in a white t-shirt approached and asked for permission to walk across the sidewalk. . . . Fernandez also saw another [Black] male in dark clothing a short time later. . . . [Detective] Fuentes subsequently showed Fernandez some photographs in an attempt to identify the two men he had seen. Fernandez was "[seventy] percent" sure that one of the pictures was of a man who had spoken to him. It was a photo of Knighton.
>
> . . . .
>
> James D. Draper, an Essex County corrections officer, testified that, on August 5, 2006, while in Weequahic Park in Newark, a young [Black] male approached and asked if he (Draper) was a police officer[.] . . . The young man told Draper that he had bought a gun from a friend, who in turn bought it from someone in Vauxhall. He found out that it was used in a robbery that "went bad." . . . .

A-0533-22

After speaking with Draper, he handed Draper a brown T-shirt that was wrapped around something; Draper knew it was a weapon. He took the package to the Union Township Police Department without unwrapping it. Inside was a .38–caliber revolver with a black handle. Ballistics tests revealed it was the murder weapon.

. . . .

Knighton testified, having already pled guilty to aggravated manslaughter and been sentenced [on August 3, 2007] to a prison term of twenty-three years, eighty-five percent to be served without parole. Under the terms of the plea bargain, he was not required to testify against defendant.

Knighton had grown up in Vauxhall and went to school with defendant. . . . Knighton and defendant spent much time together at Hawk's Tavern in Vauxhall. Each confided to the other that they needed money, and during one of the conversations, they discussed committing a robbery. Defendant agreed to get his gun from his father's house, and the two men settled on Capers as the victim, believing there "[w]ould[ not] be a fight."

Knighton claimed that Larry was in the car with them on several occasions when they discussed robbing Capers; he even participated in the conversation "a little bit." While Knighton and Larry were in the car, defendant called his father and arranged to retrieve his gun. Defendant later told Knighton he "got the gun." Together with Larry, defendant and Knighton went to a CVS drugstore and purchased stockings to use as masks; Knighton and defendant went back alone to purchase duct tape to bind Capers.

6

The State introduced surveillance tapes from the store, along with records that timed transactions shown on the tape. It suffices to say that Knighton's version of these events was corroborated by the CVS store records.

Knighton testified that the plan was to "scare" Capers into giving them money by using defendant's gun. On the afternoon of July 3, 2006, defendant called Knighton and told him that the robbery was "a go." They spotted Capers's car in the parking lot of a Dunkin' Donuts shop and decided to arrive at his house before he did and surprise him as he exited his car. On the way to Capers's house, however, Knighton saw a girl, Tanisha Jones, whom he knew. He and defendant spoke to her for a few minutes before proceeding to Capers's home. Jones testified and corroborated Knighton's testimony in this regard.

Knighton explained that when they arrived, Capers's truck was already parked in the rear of the house. Defendant parked the car a half block away, and the two men got out and walked, defendant ahead of Knighton. Knighton had a brief conversation with "[t]wo Spanish guys" next door to Capers's house.

Defendant handed him the gun, picked up a "big piece of concrete" and threw it through the window. Knighton, wearing a stocking cap, climbed through the window feet first. He was startled when he saw Capers standing in the bedroom doorway holding a hammer. He fired the gun, and Capers fell to the floor. Knighton . . . climbed back through the bedroom window without taking anything.

Knighton and defendant met back at defendant's car and drove away. They returned to defendant's father's house and then to Knighton's house, where

7

Knighton changed his clothes and noticed a cut on his right arm. Knighton and defendant then went to Hawk's Tavern. Later that evening, Knighton sold defendant's gun to someone he knew only as "Jamal," for $200, drugs and cash.

Larry testified that, on Saturday or Sunday before the murder, he drove with defendant and Knighton in defendant's car to CVS. Defendant purchased, among other things, stockings. The next night, while riding again in defendant's car with defendant and Knighton, Larry heard the two men talk about robbing somebody to get some money. Capers's name came up as a possible target because he operated a business out of his house and "always had money on him."

Larry was also present when defendant got his gun from his father. Larry had seen the gun before and described it as a ".38[-]Special with [a] black handle." When they arrived at Franklin Sr.'s house, defendant went in while Larry and Knighton waited in the car. Defendant returned with a brown paper bag that he gave to Knighton; although Larry could not see what was in the bag, defendant said it was a gun. . . .

. . . .

Franklin Sr. reluctantly testified against his son. He had previously seen two guns in the garage of the property on Augustine Place in Vauxhall that his family owned and from which he was vacating during the weeks leading up to July 3, 2006. He knew defendant "had a weapon." . . . .

Defendant called him several nights in a row immediately before the murder, asking about things that Franklin Sr. had moved from the house on Augustine Place. Defendant asked for his gun and bullets. On

8

Friday or Saturday before the murder, defendant called Franklin Sr., angry because he could not find some of the things he wanted. That night, Franklin Sr. gave defendant some brown bags and some boxes taken from [the] Augustine Place house. Although he had previously admitted to detectives that he knew defendant's gun was in one of the brown bags, Franklin Sr. testified at trial that he was not sure.

[Id. at 12-19.]

Defendant filed a petition for post-conviction relief (PCR) alleging ineffective assistance of counsel. The trial court denied the petition without an evidentiary hearing, and we affirmed. State v. Prather, No. A-3631-14 (App. Div. Feb. 21, 2018). The Supreme Court denied certification. State v. Prather, 234 N.J. 572 (2018).

While the appeal of his petition for PCR was pending, defendant filed a motion for a new trial. The motion was supported by defendant's certification and the notarized affidavits of Donta Wilson and Phillipe Barthelus, who were incarcerated with defendant at the time. Wilson and Barthelus contended Knighton separately told them that Knighton falsely testified against defendant at trial and defendant was not involved in the Capers murder.

According to defendant, Wilson approached him while he was conducting legal research in the prison law library. Wilson asked defendant where his case was tried, and defendant replied, "[U]nion [C]ounty." Wilson "revealed he was

familiar with [defendant's] name" because of an "engagement [he had] with . . . Knighton" in the Union County jail. Soon after, defendant received Wilson's notarized affidavit dated August 24, 2015, through the prison mail.

In his affidavit, Wilson contended he met Knighton in October 2008 in the holding cells at the Union County courthouse. Knighton initiated a conversation with Wilson and asked him "what steps were needed to be taken in order to withdraw his guilty plea." Knighton told Wilson "he was not, in fact, testifying truthful[ly]," and was "being compelled to testify against [defendant] . . . who was not involved in the crime, . . . in order to avoid a life time sentence."

Knighton told Wilson "he started getting high again and ran low on money," at which point he "hooked up with an old friend name[d] Larry who he was getting high with" and "the two of them decided to rob one of their ex-employers who they knew always kept money on his person."

Knighton said "he took a gun from [defendant's] car [for] the robbery," and "he and Larry broke inside of the victim[']s home." "Larry attacked the victim by striking him with a hammer . . . which resulted in a tussle." "[I]n a panic[,] [Knighton] then [shot] the victim and he and Larry ran out of the house empty handed."

According to Wilson, Knighton told defendant "everything that happened regarding the incident . . . ." Defendant "was so paranoid [that] his fingerprints could be on the gun" he "insisted that [Knighton] and Larry turn themselves into the police and to explain to the police that [the killing] was an accident." Knighton "told Larry about the conversation between [him] and [defendant,]" and said "they may have to kill [defendant] to prevent him from going to the authorities." Larry "was against murdering his own cousin."

Wilson contended Knighton admitted "he and Larry decided . . . they would pin the murder on" defendant. "[O]nce [Knighton] [was] arrested and was informed that his blood was [found] in the victim[']s house, . . . he knew that he was jammed." "[W]hen the detectives told [Knighton] that he better say something to help himself, [Knighton] . . . told them that he and [defendant] committed the robbery and it was [defendant's] plan and gun."

According to defendant, Barthelus "remembered [him] and . . . Knighton from Union County jail in 2006" and "while attending a program [in prison] . . . made contact with" defendant. Barthelus asked defendant if he was in prison "for the Union [C]ounty case in July 2006." Defendant responded affirmatively. Barthelus was "surprised, and revealed he and [Knighton] had conversations about the case." Soon after, defendant received Barthelus's notarized affidavit

11

dated September 9, 2015, through the prison mail.

In his affidavit, Barthelus claimed he and Knighton were housed in the same unit in the Union County jail in 2006 and Knighton "often spoke to [him] about" Knighton's case. "Although [Knighton] never revealed the specific details of his case with [Barthelus,] . . . . [Knighton] often expressed . . . he had falsely implicated [defendant] . . . ." According to Barthelus, Knighton "asked for suggestions[] from [him], as well as other inmates[,] . . . regarding how to reveal the truth about [defendant's] innocence." Barthelus claimed, "[a]lthough [he] never read it, [Knighton] showed [him] a letter that he had written" which "explained how [defendant] [did not] have anything to do with the crime."

On September 1, 2021, the court heard oral argument. On September 30, 2021, the court entered an order denying defendant's motion supported by a written opinion.[2] The court found defendant failed to satisfy the applicable three-prong test set forth in State v. Carter, 85 N.J. 300 (1981).

The court determined the Wilson and Barthelus affidavits were not material, nor were they the sort of evidence that probably would change the jury's verdict if a new trial were granted. Specifically, the court found:

> [D]efendant asserting he has had conversations with
> similarly situated defendants does not rise to the level

---

[2] The order is dated September 29, 2021, but was filed on September 30, 2021.

A-0533-22

of showing the [c]ourt there is evidence that indeed suggests he was framed . . . or that . . . Knighton falsely testified against him. In fact, there is a plethora of evidence to suggest otherwise . . . based on the testimony by [d]efendant's father, the testimony and videotape evidence from the CVS store, the testimony of [Larry], . . . [Jones], . . . [Fernandez], . . . [other witnesses], . . . and Detective Fuentes detailing [d]efendant's own videotaped statement.

The court also found the proffered evidence did not satisfy the reasonable diligence prong of the Carter test because defendant "failed to assert he was being set up . . . during his trial or in his appeal."

On appeal, defendant raises a single point for our consideration:

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE.

"We review a motion for a new trial decision for an abuse of discretion," State v. Fortin, 464 N.J. Super. 193, 216 (App. Div. 2020) (citing State v. Armour, 446 N.J. Super. 295, 306 (App. Div. 2016)), and will not interfere with the decision "unless a clear abuse has been shown." State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000) (citing State v. Artis, 36 N.J. 538, 541 (1962)). Motions for a new trial based on newly discovered evidence are "not favored and should be granted with caution by a trial court [because they] disrupt[] the

judicial process." State v. Conway, 193 N.J. Super. 133, 171 (App. Div. 1984) (citing State v. Haines, 20 N.J. 438, 443 (1956)).

"A motion for a new trial based on the ground of newly-discovered evidence may be made at any time[.]" R. 3:20-2. In Carter, our Supreme Court set forth the applicable three-prong test. 85 N.J. at 314. Under that test,

> the movant seeking a new trial based on newly discovered evidence must demonstrate that the evidence is, indeed, newly discovered; a new trial is warranted only if the evidence is "(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted."
>
> [State v. Szemple, 247 N.J. 82, 99 (2021) (quoting State v. Nash, 212 N.J. 518, 549 (2013))].

All three prongs must be satisfied before a defendant is entitled to a new trial. State v. Ways, 180 N.J. 171, 187 (2004). Under the first prong, "[m]aterial evidence is any evidence that would have some bearing on the claims being advanced." Nash, 212 N.J. at 549 (alteration in original) (quoting Ways, 180 N.J. at 188). "'[D]etermining whether evidence is "merely cumulative, or impeaching, or contradictory,"' necessarily implicated prong three, 'whether the evidence is "of the sort that would probably change the jury's verdict if a new trial were granted."'" Ibid. (quoting Ways, 180 N.J. at 188-89). In this respect,

14

the first and third prongs of the Carter test "are inextricably intertwined." Ibid.; see also State v. Behn, 375 N.J. Super. 409, 432 (App. Div. 2005) (recognizing the "analysis of newly discovered evidence essentially merges the first and third prongs of the Carter test").

A "reviewing court must engage in a thorough, fact-sensitive analysis to determine whether the newly discovered evidence would probably make a difference to the jury." Ways, 180 N.J. at 191. This requires assessing such evidence in the context of the "'corroborative proofs' in th[e] record." Szemple, 247 N.J. at 110 (quoting State v. Herrerra, 211 N.J. 308, 343 (2012)).

"Newly discovered evidence must be reviewed with a certain degree of circumspection to ensure that it is not the product of fabrication, and, if credible and material, is of sufficient weight that it would probably alter the outcome of the verdict in a new trial." Ways, 180 N.J. at 187-88. "The power of the newly discovered evidence to alter the verdict is the central issue, not the label to be placed on that evidence." Id. at 191-92. Evidence that "would shake the very foundation of the State's case and almost certainly alter the earlier jury verdict" would clearly satisfy prongs one and three of the Carter test. Id. at 189.

"Courts generally regard recantation testimony as suspect and untrustworthy." State v. Carter, 69 N.J. 420, 427 (1976) (citing 58 Am. Jur. 2d

New Trial § 175 (1976)); accord State v. Hogan, 144 N.J. 216, 239 (1996). "Consequently, the burden of proof rests on those presenting such testimony to establish that it is probably true and the trial testimony probably false."  Ibid. (citing State v. Baldwin, 47 N.J. 379, 400 (1966)).

Defendant contends the court erred by denying his motion for a new trial because the Wilson and Barthelus affidavits set forth the sort of evidence that would probably change the jury's verdict if a new trial were granted.  We are not convinced.

Considering defendant's contentions in light of the record and applicable law, we discern no abuse of discretion or legal error in the court's decision to deny the motion.  The court properly conducted a "thorough, fact-sensitive analysis to determine whether the newly discovered evidence would probably make a difference to the jury," Ways, 180 N.J. at 191, and assessed the evidence in the context of the "'corroborative proofs' in th[e] record."  Szemple, 247 N.J. at 110 (quoting Herrerra, 211 N.J. at 343).

The jury was presented with testimony from multiple witnesses who implicated defendant in the murder, video evidence of defendant and Knighton in CVS purchasing materials used in connection with the murder, and defendant's own statements.  The evidence included testimony by defendant's

father that defendant was looking for his handgun in the days leading up to the murder, and the testimony of Jones who saw Knighton and defendant driving in defendant's vehicle shortly before Capers was killed. In addition, the jury heard defendant's own recorded statement in which he admitted he was in the rear yard of Capers's residence with Knighton immediately before Knighton shot Capers.

Moreover, the affidavits of Wilson and Barthelus lack indicia of reliability necessary to ensure they are not the product of fabrication. For example, Wilson contends Knighton told him in October 2008 that he was being compelled to testify against defendant to avoid a life sentence and wanted to withdraw his guilty plea. That contention, however, is directly contradicted by undisputed evidence in the record. Knighton was sentenced to twenty-three years in prison in August 2007, more than one year before the alleged conversation with Wilson. He was never compelled to testify against defendant as a condition of his plea agreement or otherwise and was not facing the possibility of a life sentence in October 2008. If he did not want to testify against defendant, he could have simply refused to do so. The Barthelus affidavit is similarly lacking because he admits Knighton "never revealed the specific details of his case to" him and he did not read the letter Knighton allegedly showed him in which he exonerated defendant.

17

Accordingly, we are persuaded the proffered evidence would neither "shake the very foundation of the State's case" nor "alter the earlier jury verdict." Ways, 180 N.J. at 189. "[T]he test is whether the evidence if introduced is such as ought to have led the jury to a different conclusion – one of probability and not mere possibility." Haines, 20 N.J. at 445. The affidavits of Wilson and Barthelus do not satisfy that test.

We part ways with the trial court on its analysis of the second prong of the Carter test. If we assume for purposes of defendant's motion the facts set forth in his certification are true, the proffered evidence was discovered after trial and was not discoverable by reasonable diligence beforehand. Defendant, however, must satisfy all three prongs of the Carter test. Ways, 180 N.J. at 187. Because we are satisfied defendant failed to set forth the sort of newly discovered evidence that would probably change the jury's verdict if a new trial were granted, his motion was properly denied.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0533-22